No. 25-12396

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

MARISOL ANDRADE,
PERSONAL REPRESENTATIVE OF THE ESTATE OF
NICOLAS MORALES,
*Plaintiff-Appellant,*

v.

COLLIER COUNTY SHERIFF, ET AL.,
*Defendants-Appellees.*

Appeal from the United States District Court
For the Middle District of Florida
Case No. 2:22-cv-482-JLB-KCD
The Honorable John L. Badalamenti

# OPENING BRIEF OF APPELLANT

Noor Tarabishy
Danielle Berkowsky
Jessica Wang
Alexa Van Brunt
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
160 E Grand Avenue, 6th floor
Chicago, IL 60611
Tel.: (312) 503-1271
noor.tarabishy@macarthurjustice.org

Ellen Noble
Kathleen Pleiss
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, D.C. 20002
Tel.: (202) 869-3439
ellen.noble@macarthurjustice.org

*Counsel for Appellant*

**CERTIFICATE OF INTERESTED PERSONS &
CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel for Appellant hereby certifies the following list of trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this appeal:

Allen-Yang, Lauren, Counsel for Plaintiff

Andrade, Marisol, Personal Representative of the Estate of Nicolas Morales, deceased, and on behalf of minor N.M.

Badalamenti, The Honorable John L., District Court Judge

Bercow, Radell, Fernandez, Larkin & Tapanes, Law Firm for Plaintiff

Berkowsky, Danielle, Counsel for Plaintiff

Collier County, Florida, Defendant

Dudek, The Honorable Kyle C., Magistrate Judge

Giuffreda, Richard Allen, Counsel for Defendants

Jean, Pierre, Defendant

Jisa, Adriana Mihaela, Counsel for Defendants

Jolly, Andrew, Counsel for Defendants

Kirk, Nathan, Defendant

Li, Zhangyuan, Counsel for Plaintiff

Lomax, Christopher Martin, Counsel for Plaintiff

Lomax Legal PLLC, Law Firm for Plaintiff

Noble, Ellen, Counsel for Plaintiff

Orrick, Herrington & Sutcliffe, Law Firm for Plaintiff

Pleiss, Kathleen, Counsel for Plaintiff

Probinsky, Brent Lee, Counsel for Plaintiff

Probinsky Law, Law Firm for Plaintiff

Purdy, Jolly, Giuffreda, Barranco & Jisa, P.A., Law Firm for Defendants

Rambosk, Kevin, Defendant

Roderick & Solange MacArthur Justice Center, Law Firm for Plaintiff

Shalev, Rachel, Counsel for Plaintiff

Shoemaker, Peter, Counsel for Plaintiff

Tarabishy, Noor, Counsel for Plaintiff

Tarazona, Brian, Defendant

Van Brunt, Alexa, Counsel for Plaintiff

Wang, Jessica, Counsel for Plaintiff

Pursuant to Eleventh Circuit Rule 26.1-3, the undersigned further certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

*s/ Ellen Noble*

## STATEMENT REGARDING ORAL ARGUMENT

Nicolas Morales, a loving father and farmworker, was suffering a mental health crisis in the middle of the night. Afraid and hallucinating, he began knocking on his neighbor's door, calling for help. The police were called and, within 21 seconds of officers arriving at the scene, Morales had been fatally shot three times and mauled by a K-9 German Shepherd.

Despite ample evidence that Morales posed no serious threat of physical harm to others, as well as expert testimony that the officers' tactics and use of deadly force violated standard police practices and county policy, the district court concluded that no triable issues existed and granted Defendants' motion for summary judgment on the grounds that there was no Fourth Amendment violation. In doing so, the district court misconstrued the operative legal standard, failed to view the facts in the light most favorable to the Plaintiff, and made several additional legal errors.

In light of the importance of this case, the fact-intensive nature of this Court's inquiry on appeal, the voluminous record, and the pervasiveness of the district court's errors, Plaintiff believes oral argument would aid in this Court's assessment of the appeal and respectfully requests argument time.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............................................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF JURISDICTION.........................................................1

INTRODUCTION .....................................................................................1

STATEMENT OF THE ISSUES...............................................................4

STATEMENT OF THE CASE...................................................................4

I. Factual Background ............................................................................4

II. Proceedings Below ..........................................................................14

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW ....................................................................19

ARGUMENT .........................................................................................20

I. In assessing Plaintiff's excessive force claims, the district court applied an overly narrow per se legal rule instead of considering the totality of the circumstances. ........................................................20

II. The district court erred in concluding there are no genuine issues of material fact on Plaintiff's excessive force claim against Jean. .................25

A. A jury could conclude that Morales never threatened, attempted to harm, or otherwise posed a serious threat to others. .....................26

1. A jury could find Morales never charged at, or moved in a threatening manner towards, the officers.................................26

2. A jury could conclude that Morales never threatened anyone with a weapon...........................................................32

3. A jury could conclude that Jean had no probable cause to suspect Morales of a crime involving serious physical harm....33

4. A jury could conclude that a reasonable officer would have known Morales was likely suffering a mental health crisis....36

5. A jury could conclude that a reasonable officer would understand Morales was not willfully disobeying commands....39

B. Even if a jury found that Morales posed a threat to the officers, it could still conclude that Jean's use of force was unreasonable....42

1. A jury could find it was Jean's own reckless conduct that created the alleged threat....42

2. A jury could find that there were less lethal alternatives available to Jean....48

3. A jury could find Jean failed to warn of deadly force....50

III. The district court erred in concluding there are no genuine issues of material fact on Plaintiff's excessive force claim against Kirk....50

IV. The district court erred in dismissing all of Plaintiff's other claims against Defendants....54

CONCLUSION....55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Acoff v. Abston*,
762 F.2d 1543 (11th Cir. 1985) ....................34

*Acosta v. Miami-Dade Cnty.*,
97 F.4th 1233 (11th Cir. 2024) ....................48

*Albert v. Ass'n of Certified Anti-Money Laundering Specialists, LLC*,
No. 21-12333, 2022 WL 1415867 (11th Cir. May 4, 2022) ....................24

*Aleman v. City of Charlotte*,
80 F.4th 264 (4th Cir. 2023) ....................41

*Allen v. Tyson Foods, Inc.*,
121 F.3d 642 (11th Cir. 1997) ....................19

*Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*,
810 F.3d 892 (4th Cir. 2016) ....................36

*Arnold v. City of Olathe*,
35 F.4th 778 (10th Cir. 2022) ....................43

*Barnes v. Felix*,
605 U.S. 73 (2025)....................21, 24, 25, 31, 41

*Beasley v. O'Reilly Auto Parts*,
69 F.4th 744 (11th Cir. 2023) ....................19

*Bradley v. Benton*,
10 F.4th 1232 (11th Cir. 2021) ....................35, 38

*Brooks v. Miller*,
78 F.4th 1267 (11th Cir. 2023) ....................27, 28

*Calderin v. Miami-Dade Police Dep't*,
600 F. App'x 691 (11th Cir. 2015)....................30

*Campbell v. City of Springboro*,
700 F.3d 779 (6th Cir. 2012) ....................52

*Campbell v. City of Springboro*,
788 F. Supp. 2d 637 (S.D. Ohio 2011) ....................................................52

*Cantu v. City of Dothan*,
974 F.3d 1217 (11th Cir. 2020) ..................................................29, 50

*Estate of Ceballos v. Husk*,
919 F.3d 1204 (10th Cir. 2019) ......................................................46

*Edwards v. Shanley*,
666 F.3d 1289 (11th Cir. 2021) ......................................................51

*Fils v. City of Aventura*,
647 F.3d 1272 (11th Cir. 2011) ......................................................20

*Gilmere v. Atlanta*,
774 F.2d 1495 (11th Cir. 1985) ..................................................42, 43

*Graham v. Connor*,
490 U.S. 386 (1989)..........................................................................34

*Greer v. Ivey*,
767 F. App'x 706 (11th Cir. 2019) ....................................................33

*Gutierrez v. City of San Antonio*,
139 F.3d 441 (5th Cir. 1998) ..........................................................48

*Haley v. Gross*,
86 F.3d 630 (7th Cir. 1996) ............................................................37

*Hardigree v. Lofton*,
992 F.3d 1216 (11th Cir. 2021) ..................................................19, 25

*Hope v. Taylor*,
No. 8:20-cv-196-VMC-AAS, 2021 WL 694177
(M.D. Fla. Feb. 23, 2021) ................................................................52

*Johnson v. City of Philadelphia*,
837 F.3d 343 (3d Cir. 2016) ............................................................43

*Kirby v. Duva*,
530 F.3d 475 (6th Cir. 2008) ..........................................................43

*Knight v. Miami-Dade Cnty.*,
856 F.3d 795 (11th Cir. 2017) ....................................................................36

*Lachance v. Town of Charlton*,
990 F.3d 14 (1st Cir. 2021)..........................................................................43

*Landon v. City of N. Port*,
745 F. App'x 130 (11th Cir. 2018)..............................................................48, 54

*Latits v. Phillips*,
878 F.3d 541 (6th Cir. 2017) ......................................................................48

*Long v. Slaton*,
508 F.3d 576 (11th Cir. 2007) ....................................................................21

*McCullough v. Antolini*,
559 F.3d 1201 (11th Cir. 2009) ..................................................................22

*Medina v. Cram*,
252 F.3d 1124 (10th Cir. 2001) ..................................................................43

*Mercado v. City of Orlando*,
407 F.3d 1152 (11th Cir. 2005) ...........................................20, 21, 33, 48

*Palma v. Johns*,
27 F.4th 419 (6th Cir. 2022) ...............................................36, 47, 49, 50

*Patel v. City of Madison*,
959 F.3d 1330 (11th Cir. 2020) ..................................................................41

*Perez v. Suszczynski*,
809 F.3d 1213 (11th Cir. 2016) ..................................................................32

*Pourmoghani-Esfahani v. Gee*,
625 F.3d 1313 (11th Cir. 2010) ..................................................................28

*Priester v. City of Riviera Beach*,
208 F.3d 919 (11th Cir. 2000) ....................................................................51

*Robinson v. Arrugueta*,
415 F.3d 1252 (11th Cir. 2005) ..................................................................22

*S.R. Nehad v. Browder*,
929 F.3d 1125 (9th Cir. 2019) ....................................................................46

*Salvato v. Miley*,
790 F.3d 1286 (11th Cir. 2015) ..................................................................50

*Scott v. Harris*,
550 U.S. 372 (2007)......................................................................................27

*Sears v. Roberts*,
922 F.3d 1199 (11th Cir. 2019) ..................................................................20

*Singletary v. Vargas*,
804 F.3d 1174 (11th Cir. 2015) ..................................................................23

*Estate of Starks v. Enyart*,
5 F.3d 230 (7th Cir. 1993) ..........................................................................43

*Tabares v. City of Huntington Beach*,
988 F.3d 1119 (9th Cir. 2021) ....................................................................37

*Teel v. Lozada*,
826 F. App'x 880 (11th Cir. 2020)........................................................33, 48, 50

*Tennessee v. Garner*,
471 U.S. 1 (1985)...................................................................................34, 35

*Terrell v. Smith*,
668 F.3d 1244 (11th Cir. 2012) ..........................................................20, 22, 48

*Tolan v. Cotton*,
572 U.S. 650 (2014)......................................................................................19

*Underwood v. City of Bessemer*,
11 F.4th 1317 (11th Cir. 2021) ....................................................................43

*Vaughan v. Cox*,
343 F.3d 1323 (11th Cir. 2003) ..................................................................50

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018) ....................................................................43

*Wilson v. Miller*,
No. 1:14-CV-10, 2015 WL 5338170 (M.D. Ga. Sept. 14, 2015) ........................42

*Wilson v. Parker*,
746 F. App'x 860 (11th Cir. 2018) ........................................................45

**Other Authorities**

Fed. R. Civ. P. 56(a) ........................................................19, 25

U.S. CENSUS BUREAU, *American Community Survey 5-Year Data* (2019) ........................................................39

## STATEMENT OF JURISDICTION

Plaintiff-Appellant brought this action under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights and state law. Doc. 1 at 1-3. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a). It entered an order granting Defendants summary judgment on all claims on June 17, 2025, Doc. 170, and entered final judgment on June 20, 2025, Doc. 171. On July 14, 2025, Plaintiff timely appealed. Doc. 173. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

Nicolas Morales, a migrant farmworker, lived with his young son in the Farm Workers Village neighborhood in Immokalee, Florida. In the early morning of September 17, 2020, Morales was in the midst of a mental health crisis. Morales, who was 5′3″ and under 150 pounds, ran to his neighbor's house barefoot, wearing nothing but gym shorts, and began knocking on the door asking to be let inside. His neighbors called 911. The three defendant officers were dispatched to the scene. Before they arrived, all they knew was that a Hispanic male holding a shovel was banging on someone's door in a majority Spanish-speaking community, yelling to be let in. The officers pulled up, a safe 100 feet from Morales, and saw Morales walking away from the house, looking disoriented and distressed, with no other

civilians around. He had no gun—only a shovel and small gardening shears, which he never once raised from his side or threatened to use as a weapon.

Yet just 21 seconds later, Officer Pierre Jean had shot Morales three times. And while Morales lay on the ground, unarmed and bleeding out, crying in pain, Officer Nathan Kirk's K-9 continued to maul him for nearly a minute. Morales died within the hour.

At no point during the encounter did Morales threaten or attempt to harm anyone, including the officers. But the officers, led by Jean, had quickly encircled and closed in on Morales while yelling English commands that Morales—who spoke only Spanish—could not understand. In the final seconds, Morales attempted to run past the officers. Officer Brian Tarazona holstered his gun, backed up, and prepared for the possibility that he would seize Morales in hand-to-hand combat. But Jean—who repeatedly failed to correctly state the standard for appropriate use of lethal force in field training (which he failed out of) and whose trainers did not trust "to properly handle any call"[1]—intercepted Morales's path, stepped directly in front of him, and fired his weapon several times. After Jean's first two gunshots, Kirk deployed his K-9, which tore into Morales's shoulder for nearly a minute while Morales bled out.

[1] Doc. 156-3 at 3; Doc. 156-4 at 3-4; Doc. 156-5 at 4-5; Doc. 156-8.

On behalf of Morales's minor son, the personal representative of Morales's estate filed suit, claiming, among other things, that Jean and Kirk used excessive force in violation of the Fourth Amendment. Despite significant evidence in support of Plaintiff's position, the district court concluded that the officers' use of force was reasonable and that no jury could conclude otherwise. In doing so, the district court applied an improper gloss on the excessive force standard, narrowing the inquiry in a way that conflicts with the Supreme Court's repeated mandate that courts assess the totality of the circumstances. The district court also failed to properly apply the summary judgment standard. Usurping the role of the jury, the court repeatedly discounted Plaintiff's evidence, improperly drew inferences in Defendants' favor, and overlooked—or resolved on its own—genuine disputes of material fact.

Applying the proper summary judgment standard, a jury could easily conclude that Jean's use of deadly force was excessive—both because a reasonable officer would not have perceived Morales as posing a serious threat and because Jean's own reckless conduct, and disregard for less lethal alternatives, caused the shooting. A jury could also conclude that, regardless of whether Kirk lawfully released his K-9, he used excessive force when he did not end the K-9's ongoing attack of Morales for nearly one full minute, even though Morales was lying on the ground, visibly unarmed, and bleeding out from three gunshot wounds.

## STATEMENT OF THE ISSUES

(1) Whether the district court failed to consider the totality of the circumstances and instead applied an overly narrow and rigid standard, contrary to precedent, in assessing whether the officers' use of force was excessive.

(2) Whether a jury could conclude that Jean used excessive force in violation of the Fourth Amendment when he rushed towards and stepped in front of a small, barefoot, and shirtless man exhibiting signs of a mental health crisis, who never harmed or threatened anyone, and shot him three times—all within 21 seconds of arriving at the scene.

(3) Whether a jury could conclude that Kirk used excessive force in violation of the Fourth Amendment when he refused to stop his K-9's ongoing attack of Morales for nearly a minute, even though Morales had just been shot three times and was lying unarmed on the ground, screaming in pain.

## STATEMENT OF THE CASE

### I. Factual Background

Around 1:00 a.m. on September 17, 2020, Defendants Pierre Jean, Nathan Kirk, and Brian Tarazona responded to a 911 call at the Farm Workers Village in Immokalee, Florida. Doc. 136-7 at 2-3.[2] All Defendants knew was that a Hispanic

---

[2] References to the district court record are abbreviated as "Doc. __ at __" and use ECF pagination.

male was knocking on the caller's door, holding a shovel, and asking to be let in. *Id.* at 2-6. And they knew that many (indeed, most) residents of the Farm Workers Village in Immokalee were Spanish-speaking. Doc. 137-1 at 234:9-16; Doc. 136-6 at 213:15-17; Doc. 136-5 at 35:21-23, 37:20-25. But they had no information to suggest a crime had been committed—let alone one involving serious physical harm. Doc. 137-1 at 263:16-19; Doc. 136-6 at 276:21-23; Doc. 136-7 at 2-7, 31-32.

The man in question was Nicolas Morales, who was in the throes of a mental health crisis. Morales was seeing spirits and creatures that were out to kill him. Doc. 154-4 at 3-4. So he left his twelve-year-old son in their house and ran out, barefoot and shirtless, knocking on neighbors' doors for help. *Id.* at 3; Doc. 136-9 at 3:37. When Defendants arrived, Morales was walking down the 911 caller's driveway, away from the house. Doc. 136-9 at 3:32–37. Defendants could see that no civilians were outside and that nobody was injured or at imminent risk of injury. Doc. 137-1 at 269:9-16; Doc. 136-6 at 241:6-8; Doc. 136-5 at 227:25-228:2. Kirk noted that Morales was exhibiting "[b]izarre, unusual" "Crisis Behaviors," suggestive of a mental health episode. Doc 154-9 at 3; Doc. 137-1 at 273:21-23.

Morales was a small man: standing at 5′3″ tall and weighing 130 pounds. Doc. 154-4 at 6. Defendants, on the other hand, ranged in height from 5′8″ to 5′11″ and in weight from 180 to 240 pounds, with Jean—a former football player—the largest of the three. Doc. 136-6 at 225:24-226:3; Doc. 136-5 at 172:4-8, 178:20-22. In

addition to their guns, Jean and Tarazona carried a taser and OC spray. Doc. 136-6 at 257:4-9; Doc. 136-5 at 182:20-22. Kirk had a K-9. Doc. 136-9 at 3:44. All three were trained on defensive tactics, such as takedowns. Doc. 136-5 at 59:1-18; Doc. 136-6 at 73:22-74:5; Doc. 137-1 at 91:9-13.

Contrary to accepted police practice, Defendants did not communicate with each other about a response plan or who should take lead. Doc. 136-6 at 231:8-22, 238:6-9; Doc. 136-5 at 214:16-19; Doc. 137-1 at 226:6-8; Doc. 154-7 at 45, 48. The policy of the Collier County Sheriff's Office (CCSO) requires that K-9 officers take the lead. Doc. 154-10 at 6. And Jean knew that Kirk was responding with his K-9. Doc. 136-6 at 234:15-21. But Jean, who failed to state the proper standard for lethal force in field training and completed his second attempt at training only three months earlier, assumed the lead role nonetheless. Doc. 156-3 at 3; Doc. 156-4 at 3-4; Doc. 156-5 at 4-5; Doc. 156-8; Doc. 136-6 at 138:11-17, 205:1-5, 233:13-15.

Jean parked about 100 feet from the 911 caller's front door. Doc. 154-6 at 12. He exited his car and immediately started walking towards Morales. Doc. 136-9 at 3:30-34. Jean and the other Defendants were trained on CCSO policy, which stated (consistent with police standards) that officers must engage in a dialogue with a suspect and issue verbal directions, and should do so in a way that the suspect will understand. *See* Doc. 136-6 at 93:20-22, 94:12-14, 97:9-14; Doc. 154-7 at 45-46; Doc. 154-6 at 13. Jean knew CCSO policy requires officers to engage in de-

escalation, which includes "[t]ry[ing] to talk to the person"—"talking culturally," and, if possible, having someone speak to them in their native language. Doc. 136-6 at 93:20-22, 94:2-95:4. Jean, who did not speak Spanish and knew that many neighborhood residents did, was aware that Tarazona did speak Spanish and was also responding to the scene. Doc. 136-6 at 14:12-15:15, 213:15-17, 214:8-215:4, 234:22-24.

But Jean did not wait. As he advanced towards Morales, he yelled in English, "don't come over here!"—while rapidly changing where "here" was by continuing to walk in Morales's direction. *Id.* at 3:33. At this point, Morales (who only spoke Spanish) was still walking away from the front door and had reached the middle of the driveway, behind a green car. *See* Figure 1.



Figure 1: Doc. 136-9 at 00:03:33

As Jean passed by Kirk's car and continued to approach Morales, he unholstered his gun and pointed it at Morales. Doc. 136-9 at 3:34-37. Morales was now by the white car in the driveway, still over 40 feet away from Jean. *See* Figure 2; Doc. 154-6 at 12 (Kirk's vehicle was about 70 feet from the front door); Doc. 155-3 at 4 (driveway is 32 feet long). He held the shovel on his left side with the spade down and below his waist. Doc. 136-9 at 3:37-42; Doc. 136-6 at 260:12-18. He did not swing, raise, throw, or point the shovel at the officers at any point. Doc. 136-6 at 260:19-20; Doc. 136-9 at 3:30-44. Morales also held a pair of gardening shears in his right hand down by his side. Doc. 136-9 at 3:39-44. Morales did not raise, wave, or point the shears at the officers either. Doc. 136-9 at 3:30-44; Doc. 136-6 at 268:11-269:6.



Figure 2: Doc. 136-9 at 00:03:35

Jean continued to advance in Morales's direction—now joined by Tarazona, who had sprinted over and closed in alongside Jean. Doc. 136-9 at 3:38-41. Jean repeatedly yelled at Morales—again, only in English—to get on the ground. Doc. 136-9 at 3:32-44. Kirk could not be sure Morales heard Jean's commands due to the loud engine noise of Defendants' patrol cars. Doc. 137-1 at 301:25-302:5. Tarazona, on the other hand, thought it was likely that Morales could not understand English and thus ordered him to drop the shovel in Spanish. Doc. 136-5 at 244:4-12. Tarazona's commonsense assessment was correct. Doc. 156-11 at 5. Morales immediately complied with Tarazona's command—the only command he received in Spanish before Defendants fatally wounded him—and dropped the shovel. Doc. 136-5 at 244:4-12, 281:3-21.

Defendants had been trained on de-escalation, responding to mental health crises, and warning before using deadly force. Doc. 136-6 at 71:23-72:4; 93:15-22, 125:24-126:8; Doc. 137-1 at 94:6-95:3, 96:22-97:1; Doc. 136-5 at 71:6-72:2, 79:24-80:15, 90:12-91:23, 140:10-24; 276:20-23. Indeed, the CCSO policy specifically cautions officers to speak in low, non-threatening voices and to minimize stimulation when interacting with a person who might be suffering mental health issues. Doc. 154-11 at 5-6. This is all consistent with standard police practices. Doc. 154-7 at 44.

But contrary to policy, proper practice, and his training, Jean did not attempt to de-escalate. Doc. 136-6 at 280:16-21; Doc. 154-7 at 45-46. He did not consider

creating a perimeter. Doc. 136-6 at 266:13-15; Doc. 154-7 at 45-46. He did not lower his voice or minimize stimulation, even though, as Kirk later noted, Morales was visibly exhibiting "Crisis Behaviors." Doc 154-9 at 3; Doc. 137-1 at 273:21-23. He did not institute a dialogue with Morales or ask Tarazona to provide commands. Doc. 136-6 at 262:9-23; Doc. 154-7 at 44-46. He had less lethal weapons—a taser and OC spray—but did not use them. Doc. 136-6 at 257:6-12; Doc. 154-7 at 46-47. Nor did he ask Kirk to utilize his K-9 to apprehend Morales. Doc. 136-6 at 289:3-290:5.

Instead, Jean and Tarazona continued to eliminate the distance between themselves and Morales, boxing Morales in as he walked around the white car and headed *away* from them toward the grass median. Doc. 136-9 at 3:34-42. Morales's head and feet were turned away and his arms were down by his sides. Figures 3-4; Doc. 136-9 at 3:42; Doc. 155-2 at 3:28-30. As Morales walked along the grass median, Jean and Tarazona kept closing in, stepping sideways to their right and cornering Morales. Doc. 136-9 at 3:39-42. When they began their sidewise movement, Morales was about 20 to 25 feet away from Jean, and even further from Tarazona. Doc. 154-6 at 17.



Figure 3: Doc. 136-9 at 00:03:42


Figure 4: Doc. 155-2 at 00:03:30
(leftmost quarter of the frame is cropped)

Morales was behind a large trash can, effectively boxed in by Jean and Tarazona, who continued to track his movements. *See* Figure 5. Kirk, holding his lunging German Shepherd by the collar, ran in from Jean's left toward Morales. Doc. 154-8 at 3:29-32; Doc. 136-9 at 3:42-45. Tarazona moved sideways so as not to be "trapped" in Jean's line of fire. Doc. 136-5 at 309:18-23.




Figure 5: Doc. 136-9 at 00:03:44

As Morales attempted to run past the officers, Tarazona retreated several steps backward—maintaining his distance and keeping Morales out of reach. Doc. 136-5 at 262:19-263:4; Doc. 136-9 at 3:42-44. He holstered his gun, preparing for hand-to-hand combat if necessary. Doc. 136-5 at 263:6-22; Doc. 155-2 at 3:31-32; Doc. 136-9 at 3:43-44. Jean, on the other hand, sidestepped past the trash can and ran in front of Morales. Doc. 155-2 at 3:30-33; Doc. 136-9 at 3:43-46. There was nothing behind Jean preventing him from backing up. Doc. 136-9 at 3:44; Doc. 136-6 at 269:12-22.

Jean then, without warning (in any language) and just fifteen seconds after he had exited his car, fired four consecutive shots at Morales. Doc. 136-9 at 3:45-46. Morales dropped the shears and started falling to the ground after Jean's first shot.

Doc. 136-9 at 3:44-45. Kirk deployed his K-9 after Jean's second shot. Doc. 136-9 at 3:45. Morales was face down on the ground, bleeding out from Jean's fatal gunshots, when the K-9 tore into his shoulder. Doc. 136-9 at 3:46; Doc. 155-2 at 3:33. Kirk stood by and watched, then unholstered his gun and pointed it at Morales, who had already been shot twice in the abdomen and once in the hip. Doc. 136-9 at 3:46-55; Doc. 155-2 at 3:33-42; Doc. 136-17 at 1-2. The officers could see that Morales's hands were empty and his right arm was subdued by the K-9. Doc. 155-2 at 3:33-45; Doc. 136-9 at 3:46-58. Kirk stood by as his K-9 thrashed and dragged Morales, who cried out and vomited from the pain in his final moments. Doc. 155-2 at 3:33-37; Doc. 136-9 at 3:45-4:02; Doc. 156-12 at 2.

When Kirk finally began to approach his K-9, he raised a finger and shook his head at Jean, saying "don't fucking shoot me, you hear me?" Doc. 136-9 at 3:58-4:01. Jean said he would put his gun away, but didn't. Doc. 136-9 at 4:01-04. Sixteen seconds after the K-9 had first tore into Morales, Kirk grabbed the K-9's harness and yanked while pointing his gun; the K-9 did not release, continuing to sink its teeth into Morales's shoulder as he moaned. Doc. 136-9 at 3:46-4:42; Doc. 155-2 at 3:49-4:30. The K-9 was trained to release on verbal command, but Kirk never gave the command. Doc. 137-1 at 215:20-216:2, 322:17-19; Doc. 136-9 at 4:01-41.

After the K-9 had mauled Morales for a full 56 seconds, Kirk finally managed to remove the K-9, and exclaimed "god damn it." Doc. 136-9 at 3:46-4:42; Doc. 155-

2 at 3:33-4:29. Jean kept his gun pointed at Morales, only switching to a taser when (finally) Tarazona told him, "less-lethal." Doc. 136-9 at 4:42-51. Morales died from the gunshot wounds within the hour. Doc. 136-17 at 1. Three bullets penetrated his body. *Id.* at 6. The manner of death was homicide. *Id.* at 1.

**II. Proceedings Below**

Plaintiff Marisol Andrade, the administrator of Morales's estate, pursued claims against Jean, Kirk, Tarazona, and Collier County Sheriff Kevin Rambosk, in his official capacity, under 42 U.S.C. § 1983, alleging that Defendants violated Morales's Fourth Amendment right to be free from unreasonable seizures. Plaintiff alleged that Jean used excessive force in shooting and killing Morales, and that Kirk used excessive force both in his deployment of the K-9 and in allowing it to maul Morales for an extended period of time. Plaintiff alleged that Jean, Kirk, and Tarazona each failed to intervene to prevent the excessive use of force in violation of the Fourth Amendment. Plaintiff also alleged that Rambosk, in his official capacity as Sheriff and through his deliberate indifference in screening Jean, was the moving force behind the constitutional violation. Plaintiff brought related claims under Florida state law.

Defendants moved for summary judgment. Doc. 142.[3] The district court granted the motion. Doc. 170 at 1. The court's decision, with respect to every claim, hinged on its determination that no reasonable jury could conclude that Jean or Kirk used excessive force. On the claim against Jean, the court stated that Jean's use of lethal force was reasonable so long as he had probable cause to believe Morales posed a threat to his life. Doc. 170 at 13. The court proceeded to identify five disputed material facts, including whether Morales was experiencing a mental health crisis, whether he was suspected of engaging in a crime, whether he disobeyed commands from Jean, whether he approached the deputies while "armed," and whether he posed a threat to the deputies. Doc. 170 at 14-15.

Despite significant evidence in Plaintiff's favor, the district court concluded there were no genuine disputes as to any of these facts. In doing so, the court viewed the evidence in the light most favorable to the Defendants. The court also overlooked other genuine disputes of fact relevant to assessing whether a reasonable officer would have perceived Morales as posing a serious imminent threat and rejected "Plaintiff's version of events" wholesale based on Jean's dashcam footage even though the video shows only a portion of the events from one occluded, distant angle without critical factual context. Doc. 170 at 18, 20. Nor did the court ever consider

[3] Defendants also filed a motion for judgment on the pleadings as to certain state law claims, *see* Doc. 130, which the district court granted and Plaintiff is not appealing.

how Jean's reckless conduct directedly caused the fatal encounter or whether less lethal alternatives were available.

Next, in assessing the excessive force claim against Kirk, most of the district court's analysis focused on whether Kirk's decision to initially deploy the K-9 was reasonable. Doc. 170 at 24-27. But the court recognized it was also necessary to determine "whether the animal was allowed to continue to maul [Morales] after he had been subdued and presented no threat to the officers." *Id.* at 24. Even though Kirk failed to stop his K-9 from mauling Morales for nearly a minute as Morales was bleeding out on the ground, visibly unarmed, the court concluded that Kirk's delay was reasonable. In doing so, the court accepted Kirk's testimony as true: that he was subjectively afraid Morales was "still armed" and thought it would be safer to pull the K-9 off instead of verbally recalling it. *Id.* at 28-29. The court did not address Kirk's own statement that he saw Morales drop the shears as Morales fell to the ground from the first gun shot. *See* Doc. 154-9 at 2. Nor did the court address Plaintiff's expert testimony that a reasonable officer would have used a verbal release command immediately and especially once the attempt to manually release the K-9 failed. Doc. 141-2 at 4-9.

Relying entirely on its conclusion that no reasonable jury could find that either officer used excessive force against Morales, the district court dismissed all claims—

including Plaintiff's state law claims—and did not address the question of qualified immunity. Plaintiff appealed.

## SUMMARY OF ARGUMENT

**I.** In concluding no reasonable jury could find that Jean or Kirk used excessive force against Morales, the district court applied the wrong legal standard for Fourth Amendment claims. Contrary to binding precedent requiring courts to consider the totality of the circumstances—including, but not limited to, the need for deadly force compared to less lethal alternatives and whether warnings were provided, if feasible—the court applied a simplified, per se rule that it is reasonable for an officer to use deadly force when he has probable cause to believe that he is in danger. By embracing this overly narrow interpretation of the legal standard, the district court overlooked several critical factual disputes, including disputes regarding Morales's own conduct prior to the final few seconds of the deadly encounter, the role the officers' conduct played in creating any purported threat, and the availability of less lethal alternatives.

**II.** The district court also erred in concluding that no genuine disputes of material fact existed as to Plaintiff's excessive force claim against Jean. Drawing all justifiable inferences in Plaintiff's favor, a jury could conclude that Morales never threatened, attempted to harm, or otherwise posed a serious threat to others that would justify Jean's use of lethal force. Indeed, a jury could find a reasonable officer

in Jean's position would have understood that Morales never charged at the officers; never threatened anyone with a weapon; never attempted a crime involving serious physical harm; was likely suffering a mental health crisis; and did not willfully disobey any commands.

And even if a jury concluded that Morales did pose a threat to the officers, it could still find that Jean's use of force was unreasonable and a violation of the Fourth Amendment because it was Jean's own reckless conduct that created the alleged threat; there were less lethal alternatives (like Kirk's K-9) available; and Jean never warned Morales that he intended to use deadly force.

**III.** The district court similarly erred in concluding that no genuine disputes of material fact existed as to Plaintiff's excessive force claim against Kirk. Drawing all inferences in Plaintiff's favor, a reasonable jury could conclude (at a minimum) that Kirk used excessive force by not immediately attempting to release his K-9 after it attacked Morales, who was lying on the ground unarmed and bleeding out from three gunshot wounds, and not using a verbal release command, especially when Kirk's attempt to physically remove the dog failed. In holding otherwise, the court repeatedly accepted Defendants' self-serving testimony as true and ignored Plaintiff's contrary evidence. A jury—not a judge—should decide whether it was reasonable for Kirk to allow his K-9 to maul an unarmed, dying man for almost one minute.

**IV.** The entirety of the district court's grant of summary judgment rested solely on its erroneous determination that no jury could conclude that Jean or Kirk's use of force was unreasonable. Thus, this Court should reverse the grant of summary judgment with respect to all claims, including Plaintiff's failure-to-intervene, failure-to-screen, and state-law claims.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving part[ies]"—here, Defendants—bear "the burden of showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

When ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *accord Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021) ("All evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party."). Courts cannot "simply accept [an] officer's subjective version of events, but rather must reconstruct the

event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019).

## ARGUMENT

### I. In assessing Plaintiff's excessive force claims, the district court applied an overly narrow per se legal rule instead of considering the totality of the circumstances.

As a preliminary matter, the district court applied an overly narrow, per se legal rule that contravened binding precedent. By distilling the complex Fourth Amendment reasonableness inquiry to a one-factor test, the court improperly minimized and dismissed material facts that could lead a jury to conclude that Defendants' use of lethal force was unconstitutional, shirking its duty to "slosh [its] way through the factbound morass of 'reasonableness.'" *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012).

Fourth Amendment excessive force claims are governed by an "objective reasonableness" standard. *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). A wide variety of facts may be material to this inquiry because courts must assess the "totality of the circumstances," considering the entirety of the

interaction between the officer and seized person, not just the fatal moment. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). Ultimately, determining whether the force used was "reasonable" requires "balancing the 'nature and quality of the intrusion' against the 'governmental interest at stake.'" *Mercado*, 407 F.3d at 1157 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The government's interest is based on factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Both "actions the officer took" and the seized "person's conduct" can "carry weight in the analysis." *Barnes*, 605 U.S. at 80.

This highly fact-intensive standard "is not capable of precise definition or mechanical application." *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007). The Supreme Court underscored as much earlier this year. In *Barnes*, the Court rejected the Fifth Circuit's "moment-of-threat" rule, under which courts would only assess whether the officer was "in danger at the moment of the threat" and ignore, as irrelevant, "events 'leading up to the shooting.'" 605 U.S. at 78. The *Barnes* Court emphasized that courts must consider "all the relevant circumstances." *Id.* at 76. "[N]o rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach [the Court has] prescribed." *Id*. at 82.

Relevant here, this Court has "distilled from *Tennessee v. Garner* three key factors concerning the reasonableness of the use of deadly force." *Terrell*, 668 F.3d at 1251. Lethal force is justified if the officer (1) had probable cause to believe that the suspect posed a threat of serious physical harm to the officer or others, or that he had committed a crime involving serious physical harm; (2) reasonably believed that deadly force was necessary to prevent escape; and (3) had warned the suspect about the use of deadly force, if feasible. *See id.*; *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009); *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005). Importantly, even these three factors are not exhaustive: Though they "may be relevant in assessing the reasonableness of using deadly force, … [t]he constitutional test for excessive force is necessarily fact specific." *Terrell*, 668 F.3d at 1251.

But the district court refused to consider the full factual context. Instead, it applied a rigid, overly simplistic legal test that cannot be reconciled with precedent. While the court gave lip service to the principle that courts must assess the "totality of the circumstances," it proceeded to apply a much narrower, per se legal rule: that "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril," regardless of the other considerations set forth in *Garner*, *Robinson*, *McCullough*, and *Terrell*. Doc. 170 at 13; *see also id.* at 20. Thus, the court replaced a multi-factor,

non-exhaustive analysis with a single-factor rule that rendered the first *Garner* factor dispositive.

The district court purported to draw its rule from *Singletary v. Vargas*, in which this Court determined that an officer who faced a car barreling towards him, placing him in "imminent danger of being run over" and killed, reasonably used lethal force. 804 F.3d 1174, 1182 (11th Cir. 2015). The panel decision in *Singletary*, however, did not purport to overrule or replace the broader framework set forth in *Garner, Robinson*, *McCullough*, and *Terrell*; to the contrary, *Singletary* relied on these cases, citing them with approval in the exact passage the district court quoted. *See, e.g.*, 804 F.3d at 1181-82. Rather, *Singletary*'s analysis focused on the first *Garner* factor because of the case's specific factual context, where the officer faced a vehicle speeding towards him. *See id.* at 1181. Given the nature and "imminen[ce]" of that particular threat, *id.* at 1182, there was no question that (if it existed) non-lethal force would not suffice to abate it and verbal warnings were infeasible. For that reason, "the parties agree[d] on the governing legal principles," and the dispute on appeal centered on the first *Garner* factor. 804 F.3d at 1182.

The facts here contrast with *Singletary* in almost every way. Morales was not speeding towards an officer in a vehicle during a targeted narcotics operation; he was in an evident mental health crisis, barely clothed, barefoot, and holding gardening shears (that he never raised threateningly), as armed officers closed in on

*him*, yelled at him in a language he did not understand, and shot and killed him. Yet the district court nonetheless brushed aside numerous factual disputes relevant to assessing whether the officers' use of force was reasonable. The court's laser focus on the first factor led it to "put on chronological blinders," *Barnes*, 605 U.S. at 80, and deem facts from earlier in the encounter irrelevant (like Morales trying to move *away* from the officers, or Jean's role in creating the close-quarters encounter), even though those facts plainly informed whether a reasonable officer would perceive Morales as a threat in his final moments. *See infra* Part II.A. And the court similarly dismissed arguments that Jean should have de-escalated the situation or used less lethal alternatives because, regardless of these facts, the court's perceived "clear and present threat[] of danger" trumped everything else. Doc. 170 at 21; *see infra* Part II.B.

Because the district court applied an improperly narrow construction of the fact-intensive standard for excessive force claims, this Court should, at minimum, vacate and remand for re-evaluation under the proper framework. *See Albert v. Ass'n of Certified Anti-Money Laundering Specialists, LLC*, No. 21-12333, 2022 WL 1415867, at *1 (11th Cir. May 4, 2022) (vacating and remanding grant of summary judgment where "district court applied the wrong legal standard in evaluating [plaintiff's] claim"). But for the reasons that follow, the record makes clear that outright reversal is warranted: Summary judgment must be denied because, drawing

all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that Morales posed no threat to Jean and that, even if he did, Jean's fatal gunshots were excessive nonetheless.

## II. The district court erred in concluding there are no genuine issues of material fact on Plaintiff's excessive force claim against Jean.

The district court not only got the substantive legal standard for excessive force claims wrong, but also failed to properly apply the summary judgment standard. Again, for a Fourth Amendment excessive force claim, a wide variety of facts may be material because courts must assess the "totality of the circumstances" and consider the entirety of the interaction between the officer(s) and the seized person, not just the fatal moment. *Barnes*, 605 U.S. at 80. Summary judgment is improper if there is a genuine dispute as to any material fact, viewing the record in the light most favorable to the non-moving party and resolving all doubts in their favor. Fed. R. Civ. P. 56(a); *Hardigree*, 992 F.3d at 1223.

Here, the district court improperly discounted Plaintiff's evidence, drew inferences in Jean's favor, and misapplied precedent. Properly considering the totality of the circumstances, a reasonable jury could rely on the evidence presented to conclude that Morales never posed a serious threat to civilians or the officers at the scene. And even if a jury concluded otherwise, it could still conclude that Jean's use of deadly force was unreasonable, because it was Jean's own reckless conduct that caused the need to use deadly force and less lethal alternatives were available.

### A. A jury could conclude that Morales never threatened, attempted to harm, or otherwise posed a serious threat to others.

A jury could find that a reasonable officer in Jean's position would not have believed that Morales posed an imminent threat of serious physical harm to the officers or civilians and that Jean's use of deadly force violated the Fourth Amendment. In concluding otherwise, the district court repeatedly misapplied the summary judgment standard.

#### 1. A jury could find Morales never charged at, or moved in a threatening manner towards, the officers.

Viewing the evidence in the light most favorable to Morales, a jury could conclude that, throughout the interaction, Morales was trying to walk away from the house and evade the deputies. Doc. 136-9 at 3:34-42; Doc. 155-2 at 3:28-30; *see* figures 3-4, *supra*. And even if Morales moved towards the officers, a reasonable officer would not have perceived him as a serious physical threat justifying the use of lethal force. In holding otherwise, the district court improperly applied the *Scott v. Harris* exception and donned precisely the kind of chronological blinders that the Supreme Court has warned against.

*First*, the district court incorrectly relied on its own view of the video evidence instead of construing the record in the light most favorable to Plaintiff. *See* Doc. 170 at 18 (reasoning that "[t]he video evidence here … plainly refutes Plaintiff's version of events"). Under *Scott v. Harris*, in order for a court to disregard the nonmovant's

account on summary judgment and view the facts "in the light depicted by the videotape," the nonmovant's facts must be "blatantly contradicted" by objective video evidence. 550 U.S. 372, 380-81 (2007). The *Scott* rule, in other words, applies "only when the video actually proves that the plaintiff's version of the facts cannot be true." *Brooks v. Miller*, 78 F.4th 1267, 1271-72 (11th Cir. 2023). "[I]f the recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: we must accept the party's version for purposes of considering the motion for summary judgment." *Id.* at 1278.

Here, the obstructed dashcam footage does not displace the default rule. If anything, it *supports* Plaintiff's version of events—it shows the officers running to the right and intercepting Morales's path as he tries to dart away. Doc. 136-9 at 3:38-45. The court repeatedly determined that Morales approached Jean. *See* Doc. 170 at 18-19. Yet the court ignored the fact that, on the video, Jean is responsible for closing most of the distance between himself and Morales and is actively intercepting Morales' path when he fires his weapon. *See* Doc. 136-9 at 3:38-41.

The video certainly does not objectively contradict Plaintiff's account. For one, the video does not depict all material facts that could influence how a reasonable officer perceives Morales's movements. For example, it does not show that Morales had not committed a serious crime, was likely suffering a mental health crisis, and didn't understand the commands being made of him—all of which a reasonable

officer in Jean's position would have understood. *See infra* Part II.A.3-5. *Scott* does not apply where, as here, video fails to depict "all of the defendant's conduct and all of the necessary context." *Brooks*, 78 F.4th at 1278 (quoting *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007)).

And even the facts the video does depict are open to interpretation. Jean's dashcam footage, for example, shows just one angle of a three-dimensional encounter, making it impossible to conclusively determine Morales's trajectory and the degree to which he moved toward the officers compared to the degree to which the officers moved toward, and in front of, Morales.[4] "[V]ideo is often not obviously contradictory" of a plaintiff's version of events where it "fails to provide an unobstructed view." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010).

All in all, contrary to the district court's analysis, the video is not irrefutable evidence that Morales moved towards the officers in a threatening manner. A reasonable jury could watch the dashcam footage—by itself, but especially in context of the additional information known to Jean at the time, *see infra* Part II.A.2-

---

[4] The court did not consider Kirk's wide angle dashcam (Doc. 155-2), which shows more clearly how it was the *officers* who closed the distance between themselves and Morales. Doc. 155-2 at 3:18-25. The court also disregarded satellite views of the scene, which help show the parties' relative positions and demonstrate that Jean's dashcam does not completely and accurately capture the scene. *See* Doc. 155-1; Doc. 155-3 at 2.

5—and conclude that Morales was trying to run away from the officers closing in around him by moving to the right, behind the trash bin and in the direction of the neighbor's driveway. Then, at the same time Morales tried to dash past the officers, the officers moved to their right, intercepting his path. Doc. 136-9 at 3:40-43. Indeed, the video irrefutably shows Jean moving to his right and stepping in front of Morales as he starts shooting. Doc. 136-9 at 3:40-43. Accordingly, *Scott* does not justify the district court's intrusion onto the province of the jury. Because "the dash camera video does not answer all of the questions" and "there are ambiguities and lack of clarity about some of the details … [which] … present material factual issues," summary judgment was not proper. *Cantu v. City of Dothan*, 974 F.3d 1217, 1226 (11th Cir. 2020).

*Second*, even if Morales had pivoted closer to the officers in the final seconds before the shooting—a fact very much in dispute given that the officers were simultaneously moving to the right, intercepting his path—a jury could find that a reasonable officer *still* would not have interpreted that as a grave threat justifying lethal force. That's because, prior to that moment, a reasonable officer in Jean's position would have known Morales had not threatened anyone with a weapon or committed a serious crime, was likely experiencing a mental health crisis, and likely didn't understand the commands being yelled at him. *See infra* Parts IIA.2-5. A reasonable officer would have seen he was a small, barefoot man, looking dazed and

disoriented, wearing only a pair of a shorts, and that—seconds earlier—he had been walking *away* from his neighbor's front door and then *away* from the officers. Doc. 154-8 at 3:18-25.

Under those conditions, a jury could conclude that a reasonable officer would not have interpreted any movement in the officer's direction as a grave threat justifying lethal force. If anything, a reasonable officer would have known Morales was much smaller than the three officers and capable of being subdued in a takedown, as the officers were trained to do.

And this is not just a hypothetical. There was a second officer—Tarazona—in the same situation as Jean; he had the same information about Morales and was, if anything, more directly in Morales's path. But Tarazona did not see an imminent threat to his life that required the use of deadly force. *See* Doc. 136-5 at 263:5-8. In fact, Tarazona *holstered* his weapon when Morales ran towards the driveway because he believed that physical tackling, if necessary, would be sufficient under the circumstances. *Id.* at 263:6-22; *see Calderin v. Miami-Dade Police Dep't*, 600 F. App'x 691, 695 (11th Cir. 2015) (finding the conduct of a fellow officer at the scene "relevant to the inquiry of how a reasonable officer would react to the situation").

The district court's tunnel vision analysis, focusing almost exclusively on Morales's alleged "pivot" towards the officers in the last two seconds before Jean

shot his weapon, failed to consider how all the circumstances surrounding and leading up to the shooting would, collectively, influence how a reasonable officer would perceive Morales, regardless of the precise angle of his movements. This is exactly the type of "chronological blinder" that the Supreme Court has warned against. *Barnes*, 605 U.S. at 82.

And in this case, there's particularly good reason not to defer to Jean's own recounting of events—or his judgment in assessing whether lethal force was necessary. In field training, Jean was *repeatedly* unable to correctly answer when tested on the two-fold lethal force standard and incorrectly thought he could shoot a subject stealing a patrol car. Doc. 156-3 at 2. He appeared to think lethal force was justified whenever a suspect was noncompliant and attempting to flee, even if there was no imminent threat of serious physical injury that required an officer to use deadly force. Jean also failed to perform under stress conditions; he would "shut down during active incidents" and get "tunnel vision." Doc. 156-8. As such, his trainers did not recommend he progress and "[did] not trust [him] to properly handle any call." Doc. 156-4 at 4; Doc. 156-8. Nor does it seem that Jean's fellow officers trusted him. After the shooting, Kirk approached his K-9, raised a finger and shook his head at Jean, and said, "don't fucking shoot me, you hear me?", Doc. 136-9 at 3:58-4:01, while Tarazona later instructed Jean, who still had his gun pointed, "less-lethal," Doc. 136-9 at 4:42-51.

Ultimately, under a proper application of the summary judgment standard, there is—at the very least—a genuine dispute of material fact as to whether Morales charged at, or otherwise made any threatening movement toward, the officers that would justify Jean's lethal force.

**2. A jury could conclude that Morales never threatened anyone with a weapon.**

Not once did Morales threaten anyone or wield his gardening supplies as a weapon. In concluding that Morales posed a serious threat, the district court focused on the fact that Morales was in possession of small gardening shears and thus "armed." *See* Doc. 170 at 18-22. But the presence of a purported weapon is not dispositive. "Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016). "The ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon." *Id.*

Here, the "weapon[s]" in question were gardening tools—and Morales made no threatening moves with these tools. When the deputies arrived, they saw Morales carrying a shovel by his side with its tip facing down. Doc. 154-8 at 3:24; Doc. 136-6 at 260:12-18. They knew Morales had not used the shovel to break into the residence. Doc. 137-1 at 262:9-12. Morales never raised the shovel, swung it, or attempted to utilize it as a weapon. Doc. 154-8 at 3:24-30; Doc. 136-5 at 256:25-

257:22. And when Tarazona commanded Morales in Spanish to drop the shovel, Morales complied. Doc. 136-5 at 244:4-12, 281:3-21. Though Morales was also holding small gardening shears, which Defendant Jean claimed he believed were a knife, the shears remained in Morales's hand down by his side throughout the encounter. Doc. 136-9 at 3:38-44. He never raised them, pointed them at the officers, or used them in a threatening way. *Id.*; Doc. 136-5 at 260:14-24.

A jury could conclude that a reasonable officer would not have viewed Morales's passive holding of the shears, even misperceived as knife, as a serious threat justifying the use of deadly force. *See Mercado*, 407 F.3d at 1154-55, 1157 (finding use of force unreasonable where plaintiff, who held a knife and ignored commands to drop it, made no threatening moves towards officers); *Teel v. Lozada*, 826 F. App'x 880, 886-87 (11th Cir. 2020) (although decedent was armed with a knife, it was a material fact that she was not threatening the officer); *Greer v. Ivey*, 767 F. App'x 706, 711-13 (11th Cir. 2019) (finding that "significant issues of material fact … regarding whether [decedent] was in fact raising a knife and charging at the deputies when they shot him" precluded summary judgment).

**3. A jury could conclude that Jean had no probable cause to suspect Morales of a crime involving serious physical harm.**

There is also a genuine dispute as to whether a reasonable officer in Jean's position would have had probable cause to believe Morales had committed—or attempted to commit—a crime involving serious physical harm. In evaluating

excessive force claims under the Fourth Amendment, courts consider "the severity of the crime at issue." *Graham*, 490 U.S. at 396. Because "[t]he intrusiveness of a seizure by means of deadly force is unmatched," it is reserved for situations where "there is probable cause to believe that [a suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

That high standard was not met here. When Jean arrived on the scene, the only thing he knew was that a Hispanic male had been banging on someone's door late at night, asking to be let in, while holding a gardening shovel. Doc. 170 at 2-7. This is no doubt odd, and perhaps concerning, but it is undisputed that Morales never broke into the house or harmed anyone—nor did Jean receive any information to that effect. Doc. 136-6 at 242:24-243:8. And even if Jean had probable cause to believe Morales had been attempting to burglarize a house, "burglary alone may not be considered a crime involving the infliction or threatened infliction of serious physical harm" that justifies the use of deadly force. *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir. 1985). Thus, there is a genuine dispute as to whether Jean had probable cause to believe that Morales had committed a crime involving the infliction or threatened infliction of serious physical harm. This fact is plainly material: It is a core part of the *Graham* and *Garner* frameworks, and it informs how a reasonable officer would have perceived Morales throughout the fatal encounter.

In analyzing this fact, the district court made several errors. *First*, the court considered whether Morales "*might* have been" engaged in "*a* crime," *see* Doc. 170 at 16-17 (emphases added), but that is not the proper inquiry. The question is whether, taking the facts in the light most favorable to the Plaintiff, a jury could conclude that a reasonable officer would have lacked probable cause to suspect Morales of a crime involving the infliction or threatened infliction of *serious physical harm*. *See Garner*, 471 U.S. at 9; *see also Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (explaining that while suspect's "flight from the traffic stop was suspicious," it "would not give a reasonable officer probable cause to believe that [he] had committed crimes involving the infliction of serious physical harm").

*Second*, the court erred by relying on facts that were never relayed to the officers before the shooting. *See, e.g.* Doc. 170 at 17 (citing Doc. 136-1). For example, the court claimed the officers were investigating an attempted burglary, that Morales was "jiggling the doorknob," and that "[t]his information was relayed to deputies through CAD and dispatch audio." Doc. 170 at 17. That's just incorrect; neither CAD nor dispatch indicated Morales was jiggling the doorknob or attempting entry into the home in any way; it just said he was asking to be let in. *See* Doc. 136-7 at 2-7; Doc. 136-8. "[I]n excessive-force cases, the question is whether the officer's conduct is objectively reasonable *in light of the facts confronting the officer*," not facts of which the officer is unaware. *Knight v. Miami-Dade Cnty.*, 856 F.3d 795,

809 (11th Cir. 2017) (internal quotation omitted) (emphasis added).

Thus, there is a genuine dispute as to whether Jean had probable cause to believe Morales had committed (or attempted) a crime involving the infliction of serious physical harm, and the district court erred in concluding otherwise.

#### 4. A jury could conclude that a reasonable officer would have known Morales was likely suffering a mental health crisis.

There is also a genuine dispute as to whether a reasonable officer in Jean's position would have understood Morales was likely experiencing a mental health episode. The district court recognized that whether Jean knew or should have known Morales was suffering a mental health crisis was a material fact. *See* Doc. 170 at 14. And rightly so. A person's mental health status "is a fact that officers must account for when deciding when and how to use force." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (citing cases). This is because conduct "may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition." *Palma v. Johns*, 27 F.4th 419, 437 (6th Cir. 2022). For example, county policy (on which Jean was trained) explains that many people experiencing mental crises "will not hear [commands]" or are "unable to … cooperate for reasons beyond their control." Doc. 154-11 at 5-6.

There is significant evidence from which a jury could conclude that a reasonable officer in Jean's position would have known Morales was experiencing

a mental health crisis. An officer at the scene testified that Morales exhibited "[b]izarre and unusual" "Crisis Behaviors." Doc. 154-9 at 3. He was yelling and knocking on a door to a house he did not own in the middle of the night while barefoot, shirtless, and carrying gardening tools. Doc. 136-7 at 2-7; Doc. 154-8 at 3:24. Based on these facts, a jury could conclude that a reasonable officer would have perceived Morales as disoriented and in crisis. *See Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1127–28 (9th Cir. 2021) (holding that a reasonable officer would have understood a person was mentally ill due to their "unusual behavior"); *Haley v. Gross*, 86 F.3d 630, 633 (7th Cir. 1996) (holding that a plaintiff's "unusual actions and appearance," including walking around barefoot in his underwear, would "allow the jury to reasonably infer that he had mental problems").

Indeed, CCSO's own policies and trainings, as well as standard police practice, instruct officers to interpret such behavior as evidence of a mental health crisis that requires proper crisis intervention tactics. *See* Doc. 154-11; Doc. 154-7 at 44, 47-48. Such "departmental instructions" and "other well-known police guidance" are relevant in assessing what a reasonable officer in defendant's position would have understood. *See Bradley*, 10 F.4th at 1241. Given that Morales's behavior aligned with common perceptions of mental illness and Jean was trained to interpret such behavior as evidence of a mental health crisis, a jury could surely

conclude that a reasonable officer would have known that Morales was experiencing a mental health crisis.

In holding otherwise, the district court framed the question as "whether [the] deputies knew" that Morales was experiencing a mental health crisis. Doc. 170 at 16. And in answering that question in the negative, it relied entirely on the fact that the dispatch audio did not explicitly state as much. *Id.* But Plaintiff was not required to establish Jean's actual subjective awareness—only that a *reasonable officer* in Jean's position, seeing the behaviors Jean saw, would have understood Morales was in crisis.

The district court also minimized the relevance of Morales's mental state, explaining that "the possibility of a mental health crisis does not require deputies to ignore a clear and present danger to their own safety." Doc. 170 at 21. No one disagrees. But Plaintiff's argument is that (1) a reasonable officer would *not* have perceived Morales as a clear and present danger to their own safety, in part, because there was good reason to think Morales's bizarre late-night conduct and failure to follow commands were the result of a mental health crisis and not indicators that he intended to harm anyone; and (2) a reasonable officer would not have charged at someone suspected of experiencing a mental health crisis and then shot them within fifteen seconds of arriving at the scene, *see infra* Part II.B.1.

#### 5. A jury could conclude that a reasonable officer would understand Morales was not willfully disobeying commands.

In justifying Jean's use of deadly force, the district court relied heavily on the fact that Morales disobeyed Jean's commands to stop and get on the ground. *See* Doc. 170 at 18-22. But this fact, too, is disputed. There is ample evidence from which a jury could find that Morales could not understand Jean's commands—and that Jean should have known as much. First, Morales was disoriented and suffering a mental health crisis, *see supra* Part II.A.4; second, he may not have been able to hear Jean's commands over the noise of the officers' cars (as Kirk himself believed), *see* Doc. 137-1 at 301:25-302:5; and third—and most importantly—he did not speak English, Doc. 156-11 at 5.

On the latter point, a jury could conclude that a reasonable officer would have recognized (as Tarazona did) that Morales did not speak English and thus could not understand Jean's commands. Recall that Jean was responding to a call about a Hispanic male in Immokalee, a community in which 66% of residents speak Spanish (with roughly half of those residents not proficient in English).[5] Not only that, but Jean was specifically responding to a call in the Farm Workers Village, a residential neighborhood populated mostly by migrant farm workers. Doc. 136-6 at 215:11-13, 215:22-216:1. Jean was familiar with the area and knew that a majority of

[5] https://data.census.gov/table/ACSST5Y2023.S1601?g=160XX00US1233250&moe=true.

Immokalee residents speak Spanish. Doc. 136-6 at 213:9-17. A reasonable officer, operating with that knowledge, would have considered the high probability that Morales could not understand English. Indeed, on the scene, Tarazona did just that; he determined that Morales could not understand English and ordered him to drop his shovel in Spanish. Doc. 136-5 at 244:4-12. Morales immediately complied with that command—the only one he received in his language before he was killed. *Id.*; Doc. 136-5 at 281:18-21.

Thus, based on the record evidence, a jury could easily conclude that a reasonable officer in Jean's position would have interpreted Morales's conduct as evidence of a language barrier—not an act of defiance warranting a violent response. This is yet another genuine dispute of material fact that the district court ignored in granting summary judgment.

And at the very least, a reasonable officer aware of a potential language barrier would not have acted as Jean did—escalating the conflict and denying the Spanish-speaking officer an opportunity to meaningfully communicate with Morales. Despite knowing there would likely be a language barrier, Jean—who does not speak Spanish—decided to take the lead in pursuing Morales and repeatedly yelled commands at him in English while quickly closing the gap between them. *See* Doc. 136-6 at 213:9-17. Jean never waited for—or consulted with—Tarazona, even though he knew Tarazona spoke Spanish and was responding to the call. Doc. 136-

6 at 214:8-15, 214:24-215:4. This too is relevant to assessing whether Jean's use of deadly force was reasonable. *See infra* Part II.B (explaining juries may consider the degree to which the shooting officer's own unreasonable conduct caused the fatal encounter).

The district court brushed aside Morales's inability to understand English as irrelevant, asserting that Plaintiff failed to identify case law requiring deputies to give commands in Spanish. Doc. 170 at 22. But this again misses the point. Plaintiff's argument is not that Jean had a legal duty to speak Spanish; it's that the language barrier—and the fact that there *was* a Spanish-speaking officer on the scene who could have given intelligible commands—is highly material in assessing the totality of the circumstances, giving important context to both the "stopped person's conduct" as well as "actions the officer took." *Barnes*, 605 U.S. at 80; *see, e.g.*, *Aleman v. City of Charlotte*, 80 F.4th 264, 292 (4th Cir. 2023) (holding that a reasonable jury could find a Spanish-speaking man posed no threat when he did not obey English commands to drop his gun but made no threatening movements with it); *Patel v. City of Madison*, 959 F.3d 1330, 1339 (11th Cir. 2020) ("Patel did not speak or understand much English, and the officers recognized this fact. So when they gave him commands, they could not have reasonably anticipated that he would understand them.").

### B. Even if a jury found that Morales posed a threat to the officers, it could still conclude that Jean's use of force was unreasonable.

For the foregoing reasons, a reasonable jury would have ample basis to conclude that Morales posed no serious threat to the officers at any time. But independently, a reasonable jury could conclude that, regardless of whether Morales posed a threat to the officers in the final seconds of the encounter, Jean's use of force was unreasonable because (1) it was Jean's own unreasonable and reckless conduct that created the alleged threat; (2) there were less lethal alternatives available; and (3) Jean never warned Morales that he intended to use deadly force.

#### 1. A jury could find it was Jean's own reckless conduct that created the alleged threat.

A jury could conclude that Jean's use of force was unreasonable because any purported threat Morales posed was the result of Jean's own unreasonable and reckless conduct. In assessing excessive force claims, this Court has long considered unreasonable police conduct prior to the use of force that foreseeably created the need to use such force. *See Gilmere v. Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985) ("[A] moment of legitimate fear should not preclude liability for a harm which largely resulted from [an officer's] own improper use of his official power."); *see also Wilson v. Miller*, No. 1:14-CV-10, 2015 WL 5338170, at *5 (M.D. Ga. Sept. 14, 2015), *aff'd*, 650 F. App'x 676 (11th Cir. 2016) (citing *Gilmere* to explain that "[u]se of deadly force may not be reasonable where the officer himself created the

situation giving rise to the threat of serious physical harm"); *Underwood v. City of Bessemer*, 11 F.4th 1317, 1331 (11th Cir. 2021) (holding fact issues precluded summary judgment where, among other things, shooting officer chose to walk in front of the suspect's moving car, placing himself at risk).

A majority of other circuits also consider whether an officer's unreasonable conduct created the need to use deadly force in assessing Fourth Amendment excessive force claims.[6] Considering this factor "is simply a specific application of the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001).

A reasonable jury could conclude that Jean's conduct leading up to the shooting was unreasonable and recklessly created—within seconds—a close-

[6] *See, e.g.*, *Lachance v. Town of Charlton*, 990 F.3d 14, 26 n.ll (1st Cir. 2021) (recognizing "officers' actions or inactions leading up to the moment in question … should be considered in determining reasonableness"); *Johnson v. City of Philadelphia*, 837 F.3d 343, 351 (3d Cir. 2016) (recognizing that an "officer's own reckless or deliberate conduct" may "unreasonably create[] the need to use deadly force"); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) (holding that where "a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive"); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (holding jury could conclude use of force was excessive because officer "unreasonably created the encounter that ostensibly permitted the use of deadly force"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (holding that "the events leading up to the shooting, including the officers['] tactics, are encompassed in the facts and circumstances for the reasonableness analysis"); *Arnold v. City of Olathe*, 35 F.4th 778, 790 (10th Cir. 2022) (holding court must "consider whether the officers' alleged reckless conduct created the need to use deadly force").

quarters encounter that caused Jean to use deadly force. When Jean stepped out of his vehicle, he was 100 feet away from Morales, who was ambling away from the house, posing no immediate threat to others. *See supra* Part II.A. Despite this, Jean—joined by Tarazona—closed the distance between themselves and Morales in a matter of seconds, boxing him in behind a trash can. *See* Doc. 136-9 at 3:34-44. Tarazona then stepped back and holstered his gun, while Jean sidestepped the trash can and moved directly in front of Morales. *Id.*

This tactical decision—to rush Morales upon arrival—violated standard police practice and CCSO policy that Jean was trained to follow. CCSO officers are trained to de-escalate by maintaining and creating space between themselves and the suspect and setting up a perimeter that gives them time to assess the situation and communicate with the suspect. *See* Doc. 154-7 at 45-48; Doc. 155-13 at 84:1-85:14; Doc. 156-2 at 74:2-10. But Jean did just the opposite, rushing towards Morales and eliminating any opportunity to assess the situation at a safe distance and properly communicate with him.

Even *Defendants' own expert* found that "the tactics utilized by" the officers "that led to the present controversy were suboptimal," and that the officers should have used "their patrol vehicles as partial cover as they sought to communicate with Mr. Morales [and] develop an understanding of what was afoot at the location." Doc. 154-6 at 10, 12. This would have given them "notable reactionary gaps between

themselves and Mr. Morales" and been in compliance with "the 20 – 25 feet that police officers are commonly trained to seek to keep between themselves and subjects armed with edged and other non-firearm weapons." *Id.* at 14.

And here, Jean's decision to immediately corner and shoot Morales is particularly unreasonable because a jury could conclude that Jean knew or should have known that Morales was suffering a mental health crisis, *see supra* Part II.A.4. And it is well-established that "[l]aw enforcement officers approaching suspects" who may be mentally ill "should use special caution, both to protect themselves and the suspect." *Wilson v. Parker*, 746 F. App'x 860, 863 (11th Cir. 2018). Indeed, CCSO policy instructs that when encountering "persons suspected of suffering from mental health issues," officers "must observe and assess relevant aspects of the individual and the environment." Doc. 154-11 at 5-6. The policy cautions officers not to be "rushed," to "speak in a low, non-threatening voice," and to "minimize stimulation." *Id*. But Jean took no time to observe or assess. He rushed towards Morales with his gun raised, yelled commands at Morales in a language Morales didn't understand, and then—when Morales was just a few feet away—stepped directly into Morales's trajectory and began shooting him. *See* Doc. 136-9 at 3:32-45.

In light of these facts, a jury easily "could conclude that [Jean's] poor judgment … caused him … to act unreasonably, 'with undue haste,'" and that Jean's

unreasonable conduct "unnecessarily creat[ed] [his] own sense of urgency" and provoked the fatal encounter. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (finding fact issues precluded summary judgment on excessive force claim because officer "had 'a lot of time' to determine what to do before shooting" but "squandered all the opportunities tactically" by following suspect into an alley and away from the protection of his vehicle).

In *Estate of Ceballos v. Husk*, for example, officers were dispatched to Ceballos's house after his wife reported that he was "acting crazy." 919 F.3d 1204, 1209 (10th Cir. 2019). When the officers arrived, Ceballos's wife had left, and Ceballos was alone on his driveway, yelling and swinging a baseball bat. *Id.* at 1210. Two officers approached and "repeatedly shouted commands for Ceballos to drop the bat." *Id.* Ceballos ignored the commands and walked toward them—bat in hand—yelling "Fuck you!" until the officers fired at him. *Id.* The Tenth Circuit held that the use of force was unreasonable because (1) Ceballos didn't pose a danger to anyone when the officers approached and (2) a reasonable officer would have recognized that he was mentally ill and "taken [that] fact[] into account before provoking a fatal encounter" within "one minute of the initial encounter." *Id.* at 1217-18.

This case is more straightforward than *Ceballos.* Jean, within just 15 seconds, cornered a man who was barefoot and half-naked, acting "bizarre," exhibiting

"Crisis Behaviors," and posing no immediate danger to others. Doc. 154-9 at 3; *see supra* Part II.A. While Ceballos had previously swung a bat at his family, Morales had never used the shovel or shears as a weapon. *See* Doc. 136-9 at 3:30-44. And while Ceballos verbally responded to (and refused to comply with) the officers' commands, Morales—who Jean knew likely spoke Spanish—showed no signs of comprehending the orders he was given in English and immediately complied with the sole order he received in Spanish. *See* Doc. 136-6 at 213:15-17; Doc. 136-9 at 3:30-44. Given these circumstances, a jury could conclude Jean's escalation of the encounter was unreasonable and created the danger that led to his use of force. *Cf. Palma*, 27 F.4th at 439 (denying summary judgment on excessive force claim because officer "should have waited for backup before engaging with a mentally ill man who posed no immediate threat to anyone").

At every step of the interaction, Jean escalated the encounter with Morales and disregarded CCSO policies and training—he failed to take time to assess the situation, to maintain space and de-escalate, to effectively communicate with Morales, or to coordinate with the other officers. *See* Doc. 154-11 at 6; Doc. 154-12 at 5; Doc. 154-7 at 42-48; Doc. 136-6 at 93:15-22, 125:24-126:8, 280:16-21, 266:13-15, 262:9-23. Given Jean's disregard for his own department's guidance and training, it is "difficult to conclude that [he] acted reasonably." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998); *see also Latits v. Phillips*, 878 F.3d

541, 552 (6th Cir. 2017) (holding officer acted unreasonably because he "repeatedly violated police procedures in both ramming [the suspect's car] and running up to his car").

### 2. A jury could find that there were less lethal alternatives available to Jean.

Even if Jean could establish that Morales posed a serious threat to the officers—and even if Jean himself hadn't created any such threat—that still would not justify the use of deadly force. The defendant must also have "reasonably believe[d] that deadly force was necessary." *Terrell*, 668 F.3d at 1251; *see also Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1240-41 (11th Cir. 2024) (considering "the relationship between the need and amount of force used" when assessing excessive force claim). Thus, this Court has repeatedly held that the availability of less lethal alternatives is relevant in assessing whether an officer's use of force was reasonable under the Fourth Amendment. *See, e.g.*, *Mercado*, 407 F.3d at 1158 (citing officers' failure to use less lethal alternatives, such as a crisis negotiation team); *Landon v. City of N. Port*, 745 F. App'x 130, 136 (11th Cir. 2018) (citing expert's opinion that "officers could have used a number of less forceful means to secure" the plaintiff); *see also Teel*, 826 F. App'x. at 886 (denying summary judgment on excessive force claim because retreat and the use of pepper spray or a taser were available alternatives).

Jean was aware of—and had time and space to employ—multiple alternatives

available to him, but he chose not to. For example, upon arriving at the scene, Jean had ample opportunity to assess the situation and employ de-escalation tactics—or to seek Tarazona's assistance in speaking with Morales—instead of rushing toward Morales. *See supra* Part II.B.1; *see also Palma*, 27 F.4th at 428 ("[S]ometimes, the reasonable thing to do is monitor the suspect, issue a warning, or take cover.") (citations omitted). And even in the final moments, Jean could have attempted to use a taser and pepper spray, as he was trained to do. *See* Doc. 136-6 at 257:6-9, 289:3-6; Doc. 154-7 at 46-47.

Jean could also have relied on the use of the K-9 to incapacitate Morales without firing the fatal gunshots. Indeed, the K-9 *was* released and used to incapacitate Morales right when Jean used lethal force. *See* Doc. 154-7 at 46-47. Instead of relying on this available, less lethal alternative, Jean—who knew a K-9 officer was responding to the scene—seized the lead contrary to CCSO policy requiring that K-9 officers take the lead. *See* Doc. 136-6 at 231:16-19, 238:6-9; Doc. 154-10 at 6. And after the K-9 arrived, Jean proceeded to close the distance between him and Morales without requesting that Kirk utilize his K-9 to apprehend Morales. Doc. 136-6 at 289:17-290:5.

Because "failure to use alternatives—if officers had the time and opportunity to use them—may render use of deadly force unreasonable," the district court erred in granting summary judgment on Plaintiff's excessive force claim against Jean.

*Palma*, 27 F.4th at 428.

**3. A jury could find Jean failed to warn of deadly force.**

Finally, summary judgment is inappropriate where, as here, "a reasonable jury could conclude that [the shooting officer] had the time and opportunity to warn [the victim] that he was planning to use deadly force before he opened fire." *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003). It is undisputed that Jean never gave a warning—in *any* language—that he was about to use lethal force. And although the feasibility of providing a warning depends on time and opportunity, *Cantu*, 974 F.3d at 1231, Jean had both. When Jean arrived at the scene, he was a long and safe distance away from Morales. Doc. 154-6 at 11. And even though he drew his gun instantly and "knew [he was] at deadly force" when he saw Morales walking around the car in the driveway, Doc. 136-6 at 255:9-13, he never warned Morales that he intended to shoot, Doc. 136-9 at 3:30-44. This further demonstrates his conduct was unreasonable. *See Salvato v. Miley*, 790 F.3d 1286, 1293-94 (11th Cir. 2015) (considering officer's failure to warn before using deadly force in reasonableness analysis); *Teel*, 826 F. App'x at 889 (same).

**III. The district court erred in concluding there are no genuine issues of material fact on Plaintiff's excessive force claim against Kirk.**

The district court further erred in granting summary judgment on Plaintiff's Fourth Amendment claim against Kirk because a reasonable jury could conclude that Kirk used excessive force by, first, not immediately attempting to release his K-

9 after it attacked Morales, who was lying on the ground unarmed and bleeding out from three gunshot wounds, and, second, not using a verbal release command, especially when Kirk's attempt to physically remove the dog failed.

An unnecessarily prolonged K-9 attack constitutes excessive force in violation of the Fourth Amendment. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (finding prolonged K-9 attack of plaintiff, who "did not pose a threat of bodily harm to the officers or to anyone else," was excessive force); *Edwards v. Shanley*, 666 F.3d 1289, 1297-98 (11th Cir. 2021) (similar); *see also* Doc. 141-2 at 5 ("Accepted police standards regarding canines are that a dog must be recalled or restrained as soon as a suspect … no longer poses a threat.").

*First*, Kirk's K-9 attack of Morales was unnecessarily prolonged and excessive because Kirk did not immediately attempt to release the K-9 from Morales, even though, when the K-9 reached Morales, he posed no threat to the officers—he had been shot three times and was unarmed, bleeding out on the ground. Doc. 136-19; *see Priester*, 208 F.3d at 923 (finding continued K-9 attack of unarmed, prone suspect excessive); *Edwards*, 666 F.3d at 1297 (same). Instead of attempting to release the K-9, Kirk stood and watched for fifteen seconds while Morales cried out in agonizing pain. Doc. 136-9 at 3:46-4:01.

*Second*, even after Kirk approached the K-9 and was unable to manually release it, he *still* refused to issue a verbal release command, letting the K-9

unnecessarily tear into Morales's shoulder for, in total, nearly a minute while Morales bled out and vomited from the pain. Doc. 136-9 at 3:46-4:41; Doc. 155-2 at 3:33-37. Kirk's K-9 was trained to release upon a one-word verbal command and had no issues complying with such commands. *See* Doc. 137-1 at 215:20-216:2, 219:11-15, 220:18-25. But Kirk never gave the verbal release command—not during the fifteen seconds he stood and watched the K-9 maul a dying man, nor during the additional forty seconds when Kirk repeatedly tried and failed to physically release the K-9. Doc. 136-9 at 4:01-41.

In addition to Kirk's unreasonable delay in taking action, Kirk's failure to verbally release the K-9 was unreasonable and amounted to excessive use of force. *See Campbell v. City of Springboro*, 788 F. Supp. 2d 637, 674 (S.D. Ohio 2011) (denying summary judgment where defendant officer "chose to physically pull [the K-9] off of [the plaintiff] rather than issuing a verbal command, thereby unnecessarily extending the duration and increasing the force of the bite"); *Campbell v. City of Springboro*, 700 F.3d 779, 792 (6th Cir. 2012) (McKeague, J. concurring) (finding genuine dispute over whether officer should have verbally or physically released K-9 precluded summary judgment); *Hope v. Taylor*, No. 8:20-cv-196-VMC-AAS, 2021 WL 694177, at *7-8 (M.D. Fla. Feb. 23, 2021) (denying summary judgment where K-9 officer delayed in issuing verbal release); *see also* Doc. 141-2 at 4-9 (expert comparing this case to an unconstitutional 47-second K-9 attack in

which "the canine handler never commanded the dog to release [the suspect] and [] the dog released its bite only after the handler struggled to pull it away").

The district court concluded that Kirk's failure to call off his K-9 was reasonable because Kirk purportedly mistook the gardening shears for a gun and "needed to check to see if Morales was still armed." Doc. 170 at 28. But Kirk knew Morales was incapacitated and unarmed. *See* Doc. 137-1 at 319:22-23. Indeed, in his Use of Force Report, Kirk said he saw Morales fall to the ground, "observed the silver object fall from [his] hand, and saw that it was a pair of pruning shears." Doc. 154-9 at 1. This all happened *before* the K-9 bit down on Morales. *See* Doc. 136-9 at 3:44-45. Moreover, Kirk was trained to yell "Gun!" if he saw one, but he never yelled that the night of the shooting. Doc. 137-1 at 310:2-7, 311:4-6, 312:23-313:16; Doc. 136-9. Nor did he search Morales's body for a gun when he finally approached him. Doc. 136-9 at 3:46-4:01. Finally, even if Kirk did think Morales still had a gun, this would not explain why Kirk refused to issue a verbal release when his attempt to manually release the K-9 failed.

In finding that it was reasonable for Kirk to manually—instead of verbally—release the K-9, the district court relied solely on Kirk's own opinion that a physical release was safer because he purportedly thought that the K-9 may have been shot and could re-bite Morales after a verbal release. *See* Doc. 170 at 28. But this directly contradicts Plaintiff's expert testimony that Kirk "should have used a verbal

command" to prevent the mauling of a dying man and that once Kirk was holding the harness, he could have issued a verbal release without any risk of re-biting. Doc. 141-2 at 7-8. "An officer's good intentions do not 'make an objectively unreasonable use of force constitutional.'" *Landon*, 745 F. App'x at 134 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The district court simply ignored Plaintiff's countervailing evidence and accepted Kirk's testimony as true in violation of the summary judgment standard.

For these reasons, this Court should reverse the district court's grant of summary judgment on Plaintiff's excessive force claim regarding the duration of Kirk's K-9 attack on an unarmed and incapacitated Morales.

## IV. The district court erred in dismissing all of Plaintiff's other claims against Defendants.

Because the district court concluded that neither Jean nor Kirk used excessive force in violation of the Fourth Amendment, the court also granted Defendants summary judgment on the failure-to-intervene claims against Jean, Kirk, and Tarazona; failure-to-screen claim against Rambosk; and various state-law claims. *See* Doc. 170 at 29-38. The court's analysis of these other claims rested entirely on its erroneous conclusion that no reasonable jury could find Jean and Kirk's use of force unreasonable. *See id*. Thus, for the same reasons this Court should reverse the grant of summary judgment on the excessive force claims, it should also reverse as to all other claims.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand.

Dated: October 24, 2025

Respectfully submitted,

*/s/ Ellen Noble*

Ellen Noble
Kathleen Pleiss
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
Tel.: (202) 869-3439
ellen.noble@macarthurjustice.org

Noor Tarabishy
Danielle Berkowsky
Jessica Wang
Alexa Van Brunt
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
160 E Grand Avenue, 6th floor
Chicago, IL 60611
Tel.: (312) 503-1271
noor.tarabishy@macarthurjustice.org

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I hereby certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because this brief contains 12,914 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

Dated: October 24, 2025

*/s/ Ellen Noble*
Ellen Noble

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2025, I electronically filed the foregoing *Opening Brief of Appellant* with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/Doc. system. I certify that all participants in the case are registered CM/Doc. users and that service will be accomplished by the CM/Doc. system.

Dated: October 24, 2025

*/s/ Ellen Noble*
Ellen Noble